378 So.2d 765 (1979)
Raymond R. STONE, Appellant,
v.
STATE of Florida, Appellee.
No. 48275.
Supreme Court of Florida.
November 1, 1979.
Rehearing Denied January 31, 1980.
*767 David J. Busch and Louis G. Carres, Asst. Public Defenders, Tallahassee, for appellant.
Jim Smith, Atty. Gen., and Charles W. Musgrove, Asst. Atty. Gen., Tallahassee, for appellee.
ADKINS, Justice.
This is a direct appeal from a judgment adjudging defendant guilty of murder in the first degree and a sentence of death.
On August 22, 1974, the victim, Jacqueline Smith, reported for work at a General Electric plant. Her hours were from 3:30 p.m. until midnight. She did not return from work and, after searching for her, Marvin Smith, her husband, notified police authorities. Later in the morning her automobile was found parked in a field near her home.
The defendant had been employed by the victim's husband in May 1974 to assist in the farming of his tobacco crop. At the time of the homicide defendant was staying with the Smiths in their home.
On September 1, 1974, a body was found in the Santa Fe River approximately one-fourth mile west of a bridge. The neck region and the head were missing, as well as the left upper extremity. The hand and right upper extremity were also missing. Dr. L.F. Beamer, a pathologist, identified the torso as being that of the victim by virtue of a laminectomy scar and an abnormality of the twelfth rib.
The defendant was involved in an accident in Missouri when a truck collided with the rear of his vehicle. Defendant was hospitalized and, while in the hospital, Missouri police officials arrested him on August 31, 1974. Florida had lodged a detainer against him because the state won an appeal relating to an earlier criminal conviction for sodomy and Florida officials wished to return him for the purpose of serving the remainder of his sentence.
*768 A Florida officer met defendant in Missouri on September 4, 1974, and returned him to Florida. He was taken to Leon County Jail, then to the Lake Butler Reception and Medical Center for further medical treatment. This medical center is a part of the prison system of Florida.
Defendant was informed that he was a suspect in a murder case. Eventually defendant confessed, an indictment was returned, and, upon trial, defendant was found guilty of murder in the first degree. The sentence hearing resulted in a recommendation of death and the trial judge imposed the death sentence. This appeal resulted.
Defendant says that the court should have granted a change of venue on its own motion. Union County, the place of the homicide, was a small county in which two of the state's major penal institutions are located. Defendant contends that the jury venire was prejudiced because the prison system is the major source of revenue, directly or indirectly, for the residents of the county.
During the trial, defendant did not file a motion for change of venue. This precludes appellate review, as the appellate court must confine itself to review of only those questions which were before the trial court and upon which a ruling adverse to the defendant was made. State v. Barber, 301 So.2d 7 (Fla. 1974).
Also, there is no provision by rule or statute for the court to change venue on its own motion. The defendant has the constitutional right to a trial where the offense occurred and a change of venue granted without an appropriate motion or the consent of the defendant is of doubtful validity. North v. State, 65 So.2d 77 (Fla. 1952), aff'd North v. Florida, 346 U.S. 932, 74 S.Ct. 376, 98 L.Ed. 423 (1954). See also Ward v. State, 328 So.2d 260 (Fla. 1st DCA 1976).
The record discloses that of thirty-seven prospective jurors only two were excused because they had formed an opinion. Twenty-three prospective jurors indicated that they had heard something about the case. There had been news coverage, but there is no indication that any of the coverage was prejudicial. The ease in selecting the jury is further evidence that a change of venue was not required. See Gavin v. State, 259 So.2d 544 (Fla.3d DCA 1972).
During the voir dire examination, defense counsel requested that each prospective juror be examined individually with the others absent, "so that those who had specific knowledge of the crime would not contaminate the others' minds." The trial court did not commit reversible error in denying this motion. Such a request is addressed to the discretion of the court and the record fails to show an abuse of discretion. Branch v. State, 212 So.2d 29 (Fla.2d DCA 1968).
Defendant next contends that his confession was obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
At a hearing on the motion to suppress, it appeared from the testimony that defendant was first taken into custody in Missouri under the authority of a detainer lodged pursuant to section 941.45, Florida Statutes (1973). Defendant's conviction in another case had been affirmed on direct appeal. Stone v. State, 245 So.2d 91 (Fla. 1st DCA 1971), cert. den. 267 So.2d 329 (Fla. 1972).
Defendant then sought and received relief in a federal district court and the United States Court of Appeals, Fifth District. Stone v. Wainwright, 478 F.2d 390 (5th Cir.1973). The United States Supreme Court reversed the Fifth Circuit Court of Appeals. Wainwright v. Stone, 414 U.S. 21, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973). It was subsequent to this holding that defendant's custody was sought by the prison officials of Florida.
The automobile accident in Missouri triggered a routine identification check and a Florida official was sent to Missouri to take custody of the defendant.
Defendant, while in Missouri, was advised that he was a suspect in a murder case. When defendant was first taken to *769 the Leon County Jail (where he was held for five or six days until his admission to the Lake Butler Reception and Medical Center), he contends that he should have been taken before a booking officer as required by rule 3.111(c), Florida Rules of Criminal Procedure. Defendant was brought to Florida under a detainer related to an entirely different offense. Although he was a suspect, he had not been charged with the commission of any homicide nor had he been arrested for any new offense. Therefore, it was not necessary to take him before a "booking officer" or a magistrate.
Defendant was given Miranda warnings on no less than six different occasions. At 11:05 a.m., September 10th, he was first given the warnings. At this time, he waived his rights and did not ask for an attorney. He was again given the warnings at 1:40 p.m. on the same day, and once again defendant waived his rights and did not ask for an attorney.
On September 16th, the defendant voluntarily took a lie detector test, at which time his rights were explained to him again. He was also warned of his rights on the afternoon of September 16th. On September 18th, defendant was given Miranda warnings at 1:45 p.m. and 7:30 p.m. All of these warnings were read and reviewed with him, and he appeared to understand them.
There is evidence that defendant wanted to get in contact with an attorney during this period of time. The attorney had offices in Missouri and represented the truck driver involved in the accident in Missouri which resulted in the hospitalization of defendant. Defendant had received the attorney's card while he was in the Missouri hospital and indicated that he wished to contact the attorney so he could sue for a neck injury which he received in the accident. The record does not disclose that defendant requested counsel in connection with the homicide under investigation. At first, the defendant apparently was not worried about the murder charge. When defendant called an attorney after the confession, the call was made to this Missouri attorney.
Defendant alleged that he was told a court order required him to take a lie detector test. It was necessary to secure a court order in order to have the defendant released from jail, but defendant was told that he had a choice as to whether to take the test or not. The form delineating his rights, which was explained to him before he took the test, advised him that he did not have to take it. Defendant even admitted that he consented to take the lie detector test.
A request for counsel for an unrelated purpose is not sufficient to require interrogation to cease under Miranda v. Arizona. This was the holding in Hill v. State, 429 S.W.2d 481 (Tex.Cr.App. 1968), where the accused indicated that he was going to get counsel for an unspecified purpose.
The law enforcement officers testified that defendant did not request consultation with an attorney before questioning on either September 16 or September 18, the days he admitted his guilt. Even had he requested consultation with an attorney, that would not prohibit a subsequent waiver. In Nunez v. State, 227 So.2d 324 (Fla. 4th DCA 1969), the court stated:
Simply stated, the question is whether an accused in custody, having once made known his desire to have the assistance of counsel, may subsequently voluntarily waive such right.
We think this question must be answered in the affirmative, because an accused in custody is just as much entitled to waive the constitutional rights outlined in the Miranda case as he is to insist upon them.
Just before the polygraph test, the defendant was given adequate Miranda warnings. The examination began at 10:30 a.m. and lasted about one and one-half hours. Within minutes after learning he flunked the test, defendant confessed.
The ruling of the trial judge that the confession was freely and voluntarily made comes to this Court with the same presumption of correctness which attends *770 jury verdicts and final judgments. We are not at liberty to substitute our views of the credibility or weight of conflicting evidence for that of the trial judge and his ruling should not lightly be set aside. Stanford v. State, 110 So.2d 1 (Fla. 1959). We hold that the statements were freely and voluntarily made and there were no Miranda violations.
Defendant says he was denied due process of law and a fair trial because the trial court allowed into evidence pieces of bone, blood samples, and expert testimony relating to the exhibits. He contends that the evidence was not sufficiently tied to the offense and was produced solely for the purpose of prejudicing the jury.
The lengthy taped statement of the defendant contained the following:
She walked around and got in on the passenger side and she did go around behind my car like that to get in. And she wasn't excited or nervous or none of that. And neither was I at the time but I was drinking that beer and smoking that marijuana and, uh, she said, you know, where we going. I said yeah, but you ain't going to like it. And she said, `Well, I'm sure that you made up your mind that you are going to meet me,' she said, `Everyone else meets me when I ask `em to.' Now she did not mention no names or none of that and I said, well, just like I told you, I said, but you ain't going to like it. So I drove down, I turned left down on Highway 18 and went down to this other road and turned right. There's a big long bridge there and it's a new black top paved road.
.....
... So I went down that road there and I stopped in the middle of the bridge. I shut my lights off and I got out. The light did not come on in my car, you know, because I had a blowed fuse and I had wrapped it with tinfoil but my radio wouldn't even play. So, I get out and I walk around the car like this and I had the hatchet behind me like this. I opened the door for her, see, okay, she started to get out and I hit her in the head with the hatchet. Not the sharp point now, but the back of the hatchet.
.....
She fell down. And I had, had trouble gettin' over the bridge. And the way I dumped her over the bridge, I had to get her feet up there first, you know, and keep inch up like that till I got her over the bridge.
.....
... she had on a pair of shorts and I don't know if it was a blouse or a sweater. Now, that's all I can say but as far an anything else she did not have nothing, there was nothin' in my car that belonged to her.
The state attempted to demonstrate that defendant's statements as to how he struck the victim and what he did with the body were consistent with the evidence. The headless torso, identified as the victim, was found one-fourth of a mile west of the bridge described in defendant's statement. The skull was found 150-200 yards west of the bridge. Not only was the skull consistent with a white female of the victim's age, but it showed trauma exactly where defendant admitted striking the victim.
On the day the body was found (nine days after the homicide), a spot was found within the section of railing where defendant said he threw the body into the river. This spot was removed and a serologist was unable to determine the blood group factor. Also admitted into evidence was a blood sample secured from articles that had been in defendant's automobile. The defendant led the way to the discovery of this blood sample. These pieces of bone, blood samples, and expert testimony relating to such exhibits were properly admitted into evidence.
It is a fundamental principle of evidence that any fact relevant to prove a fact in issue is admissible into evidence unless its admissibility is precluded by some specific rule of evidence. State v. Wadsworth, 210 So.2d 4 (Fla. 1968); Williams v. State, 110 So.2d 654 (Fla. 1959).
*771 The condition of the skull corroborated the statement of the defendant, in that there was evidence of a trauma. In the opinion of an expert "an appreciably large amount of force" caused the trauma "at or near the time of death." The skull was admissible as being relevant in proving the manner in which the homicide was committed. See Larmon v. State, 81 Fla. 553, 88 So. 471 (1921), where the skull of the deceased was held admissible to show the course of the bullet.
The evidence of the blood stains and the testimony of experts met the test of relevancy and such evidence was properly admitted. Defendant's objections went primarily to the weight to be given to such evidence. This was for the jury, and the jury was fully apprised on the limitations of the probative value of such evidence.
Defendant next contends that the taped confessions were played to the jury before the state had established the corpus delicti of the crime and he was thereby denied due process of law and a fair trial.
The corpus delicti in homicide cases consists of three elements: the fact of death, the criminal agency of another person as the cause thereof, and the identity of the deceased. Lee v. State, 96 Fla. 59, 117 So. 699 (1928).
The guidelines in determining whether the corpus delicti was adequately proved prior to the admission of the confession in the evidence are set forth in Frazier v. State, 107 So.2d 16, 26 (Fla. 1958), as follows:
It is true that before a confession should be received in evidence there must be some independent proof of the corpus delicti. Parrish v. State, 1925, 90 Fla. 25, 105 So. 130; Keir v. State, 1943, 152 Fla. 389, 11 So.2d 886. There should at least be some additional substantial evidence, either direct or circumstantial. Tucker v. State, 1912, 64 Fla. 518, 59 So. 941. The corpus delicti need not be proved beyond a reasonable doubt, but it is enough if the evidence tends to show that the crime was committed. McElveen v. State, Fla. 1954, 72 So.2d 785; Graham v. State, 1943, 153 Fla. 807, 16 So.2d 59. The only question is whether the evidence of the corpus delicti is prima facie sufficient to authorize the admission of the confession. Nickels v. State, 1925, 90 Fla. 659, 106 So. 479, supra; Graham v. State, supra. See Annotation: 45 A.L.R.2d 1316 (1954).
The fact of the death was conceded and the identity of the deceased was demonstrated by the most available evidence, considering the decomposition of the body. See Trowell v. State, 288 So.2d 506 (Fla. 1st DCA 1973). The body was the right size, color, and sex. Examination of the body disclosed a laminectomy scar similar to an operation the victim had undergone. Also, a congenital abnormality of the 12th rib of the corpse corresponded to an abnormality appearing in an X-ray of the victim. The doctor identified the body of the deceased to a reasonable medical certainty. Also, there was proof that the shorts on the body were those of the victim.
The proof was more than adequate to show the criminal agency of another. The element need not be established beyond a reasonable doubt for the purpose of admitting a confession.
The victim "punched out" from work at midnight and, under ordinary circumstances, would have arrived home one-half hour later. She always returned home immediately after work and the record clearly shows that she was a good, hard-working woman. There is no evidence indicating or implying that she would enter the waters of the river in the middle of the night, naked from the waist up, and with her shorts and underpants partially removed. There were scuffle marks around her car. A broken key chain was found on the floorboard. The evidence of foul play was sufficient to show that her death was caused by the criminal agency of another. A sufficient predicate was laid for the introduction of the taped confession into evidence.
During the sentencing procedure, the prosecuting attorney argued that defendant was a person "under sentence of imprisonment." The trial judge found as *772 an aggravating circumstance that the crime was committed "while the defendant was under sentence of imprisonment." § 921.141(5)(a), Fla. Stat. (1973).
Defendant was first taken into custody in Missouri after the United States Supreme Court ruled that he had been improperly discharged by a federal district court from a sodomy conviction. Defendant was detained by the Missouri authorities at the request of the state of Florida, and he was returned to Florida for the purpose of serving this sentence. Defendant says that he was not under sentence of imprisonment at the time of the homicide because he had been released by a federal court order. The state contends that the legislature intended to cover persons under sentence of imprisonment, whether released by reason of bail, probation, parole, mandatory conditional release or otherwise.
The sole purpose of the federal proceedings in habeas corpus was to determine the legality of the restraint on liberty. Fast v. Wainwright, 310 F. Supp. 404 at 405 (So. Dist.Fla. 1970), aff'd 439 F.2d 1162 (5th Cir.1971). As long as the proceedings in federal court were pending, defendant was under sentence of imprisonment, and would remain so until the federal proceedings were concluded favorably to defendant. The final determination was that defendant be returned to custody.
The trial judge also found the following aggravating circumstances:
... B. At the time of the crime for which he is to be sentenced, the Defendant had been previously convicted of more than one felony involving the use or threat of violence to some person. C. The murder of Jacqueline Smith by the Defendant, Raymond R. Stone, was especially heinous, atrocious and cruel. D. The Court does not consider the remaining aggravating circumstances enumerated in Section 921.141(5), Florida Statutes, applicable to the Defendant... .
Inasmuch as the trial court found these other aggravating circumstances, and no mitigating circumstances, death is presumed to be the proper sentence. State v. Dixon, 283 So.2d 1 (Fla. 1973).
Defendant's claim that his use of beer and marijuana should have been considered in mitigation is negated by the testimony of witnesses who saw him at various times shortly after the homicide. On each occasion, he seemed normal, not intoxicated. His behavior in cleaning up the blood after the homicide, preparing to flee and leaving the area, demonstrate his awareness that his action was wrong. He even discussed the fact that he was in trouble and the advisability of running away shortly after the killing.
Defendant said that the victim parked her own car and joined him voluntarily, apparently for a dalliance. He prepared for the meeting by hiding a hatchet behind his back. He backhanded the victim at one point, making her nose bleed, then struck her several times over the head with the blunt side of the hatchet. To assure that she would have no chance of recovery, he threw her body into the river from a bridge.
Defendant relies upon Swan v. State, 322 So.2d 485 (Fla. 1975) to reduce the sentence to life imprisonment. In Swan, the defendant administered a severe beating to the victim before she died and this Court reversed a sentence of death. Swan involved a 19-year-old boy engaged in a burglary or robbery. The defendant Stone was 36. There was no indication that Swan used a deadly weapon. Stone used one. Swan's victim lived for a week while Stone inflicted a beating sufficient to kill. The previous record of Stone was more serious than that of Swan. Swan's jury recommended mercy while Stone's recommended death and the jury recommendation is entitled to great weight. Tedder v. State, 322 So.2d 908 (Fla. 1975).
Also distinguishable is Halliwell v. State, 323 So.2d 557 (Fla. 1975) where this Court reversed the death sentence imposed upon a defendant who had been convicted of murdering his paramour's husband. He beat the victim to death with an iron bar and dismembered the body after death. The victim in Halliwell had bragged about beating *773 his wife and this triggered Halliwell's passion and provoked the fatal beating. Stone had no such excuse. Halliwell had no criminal record and was a highly decorated Green Beret. Stone spent most of his life in institutions.
In Salvatore v. State, 366 So.2d 745 (Fla. 1978), the defendant, with no significant criminal history, bludgeoned the victim to death then disposed of the body by dumping it at sea. The death sentence was held to be appropriate. Defendant Stone bludgeoned the victim to death and disposed of the body by dumping it in a river. He had a significant criminal history. Compared with Salvatore, the death sentence here was appropriate.
Even though defendant confessed and even though he expressed a desire to be executed, this Court has, nevertheless, examined the record to be sure that the imposition of the death sentence complies with all of the standards set by the constitution, the legislature, and the Court. See Goode v. State, 365 So.2d 381 (Fla. 1978).
The sentence recommendation of the jury was rendered July 18, 1975. Sentence was imposed on October 1, 1975. On August 26th and September 2nd, 1975, defendant's trial counsel forwarded copies of psychiatric reports to the trial court which disclosed that defendant was admitted to the Farmington State Hospital on June 8, 1955, under the alias "Walter Herron." The case history of defendant included an incident which occurred when he was eleven years of age. At that time he and two other boys bound another child and threw the child into a river where he drowned. The diagnostic report revealed the following:
Sociopathic youth from a deprived and depraved environment whose basic trust in others is so low that the possibility of an uneventful adjustment is considered very doubtful. He is considered to be of low average intelligence and in good contact with reality; however, his stated and perhaps fantasized revenge motives towards individuals and society are so malignant that he may constitute a grave danger to others upon his release from custody.
The hospitalization occurred between 1955 and 1958 and this remoteness seriously affects its use as a mitigating factor.
The defendant testified at the sentence hearing and stated that he had been in mental institutions at various times until he was 19 or 20 years of age. He relies upon Messer v. State, 330 So.2d 137 (Fla. 1976) and Miller v. State, 332 So.2d 65 (Fla. 1976) where we ordered new hearings for sentencing purposes because of failure to afford defense counsel an opportunity to present psychiatric testimony to the jury. The Court in the case sub judice did not declare the reports inadmissible. In fact, the reports had not been received and, therefore, could not be presented to the jury. Neither the judge nor defense counsel could be faulted for the absence of the reports at the jury phase of the sentence hearing.
Defendant knew he had been hospitalized and testified before the jury to that effect. Stewart v. State, 339 So.2d 710 (Fla.2d DCA 1976), involved a situation where the defendant did not inform counsel that he had been found criminally insane while using another name until after his conviction. Stewart is not applicable for it involved newly-discovered evidence while the instant case does not.
There is nothing in the record from which the trial court could conclude that a mental examination would be appropriate. Although defendant testified as to his use of beer and marijuana, there were many witnesses who saw him at various times shortly after the homicide. On each occasion he seemed normal, not intoxicated. Also, there is no evidence that defendant could not distinguish right from wrong. Quite the contrary, his behavior in cleaning up the blood, preparing to flee and leave the area, demonstrates his awareness that his act was wrong. According to the defendant's statement, he specifically discussed the fact that he was in trouble and the advisability of leaving town shortly after the killing.
*774 The reports furnished the trial judge prior to sentencing included a psychiatric examination made in 1955 when defendant was sixteen years of age. At that time "it was felt that for some reason the patient was malingering in an effort to get a low grade, but that nevertheless he was mildly mentally defective." Three years later the staff diagnosis was "sociopathic personality without mental disease." On April 15, 1958, he was discharged from the hospital and transferred to the penitentiary. There is no evidence of mental illness. From these reports, his observation of the defendant, and the evidence produced in the case, the trial judge found that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired. In other words, the trial judge found no mitigating circumstances, so the death sentence was appropriate.
The defendant's attack upon the constitutionality of the Florida statute providing for the death penalty is without merit. Proffitt v. State, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
We have reviewed the evidence to determine whether the interest of justice requires a new trial. No reversible error is made to appear and the evidence does not reveal that the ends of justice require that a new trial be awarded. We find that the judgment and sentence of the trial court in this cause is in accordance with the justice of the cause.
Accordingly, the judgment and sentence of the circuit court are hereby affirmed.
It is so ordered.
ENGLAND, C.J., and BOYD, OVERTON and SUNDBERG, JJ., concur.