386 So.2d 836 (1980)
Ann BECKWITH, Betty Beckwith, Charlie Brigham, Edward Brown, Melissa Day, John E. Fairchild, C.D. Faircloth, Norma N. Faircloth, Bradley Harvell, George Wesley Harvell, Vera Henderson, Bert Phillips, Geraldine Potter, W.L. Potter, and Robert Walden, Petitioners,
v.
STATE of Florida, Respondent.
No. TT-431.
District Court of Appeal of Florida, First District.
August 7, 1980.
*837 Joseph C. Jacobs and Lewis M. Killian, Jr., of Ervin, Varn, Jacobs, Odom & Kitchen, and M. Howard Williams, Tallahassee, for petitioners.
Jim Smith, Atty. Gen., and David P. Gauldin, Asst. Atty. Gen., Tallahassee, and Curtis A. Golden, State's Atty., Pensacola, for respondent.
ROBERT P. SMITH, Jr., Judge.
The 15 petitioners seek certiorari review of an order of the Circuit Court of Liberty County granting the State a change of venue for trial, to Leon County, on the ground that it is practically impossible to obtain an impartial jury in Liberty County, where the defendants reside and where they allegedly committed the felony of buying the votes of others. Section 104.061(2), Florida Statutes (1979).
The trial court has not made an exhaustive and unsuccessful effort to seat an impartial jury in Liberty County. For that omission we quash the order and remand the case for a more persevering effort to secure an impartial jury in Liberty County. Article I, Section 16, Florida Constitution; Ward v. State 328 So.2d 260 (Fla. 1st DCA 1976).
The trial court based its order changing venue on the testimony of several witnesses and on the court's own observations of the venire, the jurors, parties, witnesses, and spectators in two vote-buying trials held in Liberty County in December 1979. One of those trials resulted in a guilty verdict ("sheer luck," the trial judge said) and the other, disadvantaged by inadequate jury security and spectator control, was declared mistried when a juror spoke during recesses with the accused, petitioner Edward Brown, and then denied to the court that he had done so.
The trial court's order and the record on which it was entered make a formidable showing of conditions in Liberty County giving rise to doubts about the availability of an impartial jury: the complex relationship among families in this second-smallest Florida county; the familiarity most everyone has with most everyone else, and widespread conversation about vote-buying and these prosecutions; the alliances, allegiances, and antipathies which color the county's politics, public education system, and public employment; the feeling among some in the community that the buyers of votes should not be prosecuted if the sellers are not (it is not a violation of Section 104.061 to sell one's vote); the influences and pressures which threaten prospective witnesses and jurors; and the consequent lack of candor of some veniremen and some witnesses. If conventional methods of *838 proof were alone sufficient to show the impossibility of seating an impartial jury, or if the trial judge's earnestness of opinion and felicity in expressing it were sufficient grounds for sustaining his action, we should immediately affirm and, so doing, recede from Ward.
But with all deference to the contrary and well-spoken opinion of the trial judge, we cannot sustain this departure from the rather explicit holding of Ward and, vastly more important, from the historical and legal precedents which Ward sought to preserve. Over the defendant's objection, the State may not be granted a change of venue from the county where the State charges the defendant committed the crime, to a county where the State fancies it may find a jury that will do its duty less reluctantly, until the impossibility of seating an impartial jury where the offense was laid has been verified by an exhaustive attempt to seat such a jury.
We suggested in Ward that the defendant's right to jury trial in the county where the offense was committed is as old as the jury system itself, and is inseparable historically and doctrinally from that system. It is a right carefully included in the constitutions of the original states of this union, written there by colonists who rebeled at the idea of prosecutors carrying citizens away for trials in far places, where they were strangers. Florida's Constitution assures these Liberty Countians, as it has assured all our forebears since 1885, that they will be tried at home, by a jury of their own county, for crimes allegedly committed at home; that they will be tried abroad only for crimes committed abroad. There is but one constitutional exception to the rule, namely, "the impossibility of securing an impartial jury in that county." Hewitt v. State, 43 Fla. 194, 199, 30 So. 795, 796 (1901) imposed that constitutional restriction on a statute which seemingly authorized more liberal changes of venue; and Ward concluded that the Supreme Court would read that same constitutional restriction into Fla.R.Cr.P. 3.240, together with the test determining "impossibility" as prescribed by other Supreme Court decisions. Recently, citing Ward, the Supreme Court reemphasized the "doubtful validity" of changing the place of trial over the defendant's objection:
The defendant has the constitutional right to a trial where the offense occurred and a change of venue granted without an appropriate motion or the consent of the defendant is of doubtful validity. North v. State, 65 So.2d 77 (Fla. 1952), aff'd North v. Florida, 346 U.S. 932, 74 S.Ct. 376, 98 L.Ed. 423 (1954). See also Ward v. State, 328 So.2d 260 (Fla. 1st DCA 1976).
Stone v. State, 378 So.2d 765, 768 (Fla. 1980) (dictum).
The means by which the impossibility of securing an impartial jury is to be determined, when on that ground the State wishes to change the venue for trial, is implied from the very word impossible, which here means practically impossible, impossible as a practical matter. The term does not mean absolutely impossible, as would be implied by examining every resident of the county for jury service, only to find that six impartial persons cannot be found; but neither does the term impossible simply mean difficult, problematic, inconvenient, laborious, or frustrating. When the State urges that it is practically impossible to secure an impartial jury, what is required is a showing that such a jury cannot be secured by an exhaustive or persevering judicial effort. And the way for the trial judge to determine that possibility or impossibility is to summon a venire, swear them, join with counsel in asking them questions bearing on their qualifications, and excuse both the partial jurors and the evasive ones by exercising that skill of judgment which Justice Alderman described in Manning v. State, 378 So.2d 274, 279 (Fla. 1979) (dissenting opinion):
In some cases, it is not advisable for the trial judge to rule on a motion for change of venue until after the jury selection process actually begins. This is the "acid test" to determine if it is possible to obtain a fair and impartial jury. *839 During the jury selection process, the trial judge is in the best position to make the final decision as to whether a fair and impartial jury can be obtained. He has the opportunity to observe firsthand the prospective jurors during the voir dire examination, to weigh the credibility of their answers, and to judge the state of their minds as well as the general atmosphere in the courtroom and the community.
Judging of this type is an art, not a science. It is not possible to reduce all of the elements considered by a trial judge in such a situation to a computer card and obtain a mechanistic answer. In deciding a motion for change of venue, more is involved than the sterile application of legal principles. The trial judge must also function as the finder of facts.
The Court's decision in Manning, that a defendant's motion for change of venue may be determined either before trial or after an attempt is made to seat a jury, does not affect the requirement that an exhaustive or persevering effort be made to seat an impartial jury when the State moves for and the defendant resists a change of venue for trial. Indeed, the Court's reference to Singer v. State, 109 So.2d 7, 14 (Fla. 1959), underscores the difference between the two situations. Manning, 378 So.2d at 277, quoted Singer:
A change of venue may sometimes inconvenience the State, yet we can see no way in which it can cause any real damage to it. On the other hand, granting a change of venue in a questionable case is certain to eliminate a possible error and to eliminate a costly retrial if it be determined that the venue should have been changed. More important is the fact that real impairment of the right of a defendant to trial by a fair and impartial jury can result from the failure to grant a change of venue.
Similar reasoning requires an actual attempt to seat a jury when the defendant resists a change of venue for trial. The State cannot be damaged in any way by a persevering attempt to empanel a jury, and the attempt may be successful, confounding all the analysts and prophets of impossibility. See, e.g., Stone, supra, 378 So.2d at 768: "The ease in selecting the jury is further evidence that a change of venue was not required." And if the effort is unsuccessful, it is not for that reason futile; the effort affords the accused, insofar as reasonably possible, his right to trial by impartial jury in the county where it is charged he committed the crime. Thereby the court decides the critical issue not by weighing the opinions or predictions of a few selected witnesses who are asked whether others can be impartial  there is much of that in this record, and not a little hearsay  but by making individual judgments about particular prospects who are questioned under oath in the jury box. That is "the acid test." Manning, supra, 378 So.2d at 279 (dissenting opinion).
The more debatable question in this case is whether the required attempt to empanel an impartial jury was satisfactorily made in the December 1979 experience of empaneling a jury for the Edward Brown trial, which as stated above ended in a mistrial for juror misconduct. (Although the State moved for a venue change before the earlier Thomas Brown trial, neither the State nor the trial judge now suggest that the convicting jury in that case was less than impartial.) On this subject the trial judge found:
During voir dire at the first trial, prospective jurors seemed candid and at ease whereas at the second trial they were evasive and at least three were so infected by community influence that their qualifications were not truthfully determined on voir dire. In the second case the Court and the attorneys tried as hard as possible under the law to empanel the jury and still three jurors were obviously not impartial. This court sincerely feels that the defendants, their families and political connections has and will exert such undue influence over witnesses and jurors that they would not all answer truthfully the questions on voir dire. This court will not attempt to review the evidence or testimony in much greater *840 detail but would state that the court observed first hand the prospective jurors during voir dire examination of two trials and the motion hearings, therefore had the opportunity to weigh the credibility of their answers and judge the state of their mind as well as the atmosphere in the courtroom and community.
.....
This court recognizes that attempted jury selection is recommended as the best test, however, the law does abhor a useless act and from this Court's experiences in these cases it is obvious and conclusive that a fair and impartial jury is practically impossible. This Court cannot escape this conclusion when proof is made that direct and subtle efforts to influence jurors and witnesses occurred; where friends and families of the defendant smiled and winked at each other when the second jury was sworn to try the case; nor can the Court overlook or forget the look of relief on their faces when the jury was sworn. Neither can the Court overlook or forget the chuckles and looks of satisfaction when two witnesses suddenly forgot the facts about which they were to testify; nor could the court overlook or forget the look of despise and disgust on the face of the spectators when some incriminating testimony was given.
Of significant importance to this Court also is the peace of mind and well being of persons called for jury service and as witnesses. To a person they were nervous, somewhat frightened, all apprehensive... .
Spectators may be controlled and sitting jurors may be protected from improper influences by less drastic measures than changing the trial venue over the defendant's objection. The State does not suggest here that the recalcitrance or intimidation of witnesses is a ground for moving the trial, from a county which can otherwise produce an impartial jury, or that moving the trial will lessen the necessity for candor and courage in witnesses who must return home eventually. Therefore we are principally concerned with the trial judge's findings that "to a person" the veniremen at the second trial "were nervous, somewhat frightened, all apprehensive"; that the prospective jurors "were evasive"; and that "at least three were so infected by community influence that their qualifications were not truthfully determined on voir dire."
Giving full credit to these observations by the trial judge, and disregarding questions about the evidentiary or other basis for the last stated finding, the jury selection in the Edward Brown trial, and these resulting findings, are insufficient either to satisfy or to dispense with the requirement for an exhaustive or persevering attempt to draw an impartial jury from Liberty County. It is quite clear that any "evasive" veniremen, recognized on voir dire at the December trial or recognized now in the light of the testimony since adduced, can and should be excused as unqualified for jury service. At the Edward Brown trial only nine veniremen were challenged for cause akin to partiality or prejudice, and all but one of these candidly admitted having at least some fixed opinion; only two challenges for cause  one by the State, one by the defense  were denied by the court. The prosecutor used only four of his six peremptory challenges, later explaining that he thought other jurors were not "being candid with us" and he wished to challenge them but did not, for fear of replacements to whom he objected also. Neither the State nor the court is obliged to be satisfied with a jury made of people who answer voir dire questions evasively. It is somewhat puzzling why veniremen observed by both the prosecutor and the trial judge to be "evasive," or not "candid with us," were not challenged by the State and excused by the court for cause. No doubt challenges for that cause will be more fruitfully employed, if necessary, when the court again attempts to seat a jury in Liberty County. Carefully wrought decisions to excuse prospective jurors for cause are seldom if ever grounds for appellate concern. Piccott v. State, 116 So.2d 626 (Fla. 1959); Newton v. State, 178 So.2d 341 (Fla. 2d DCA 1965); Sims v. State, 184 So.2d 217 (Fla. 2d DCA 1966).
*841 Perhaps as a result of seating "evasive" jurors without challenge, only 27 potential jurors were questioned in the Edward Brown trial, and three of those were released for reasons of health or nonresidency. Compared to widely publicized criminal trials in which scores of veniremen are examined in an effort to seat a jury in the county where the defendant thinks a fair trial is impossible, 24 prospective jurors out of a pool of some 2900 registered voters is hardly a fair sampling; and if all 24 had been found to be partial (or "evasive"), that would not nearly qualify as a persevering effort which reveals, like the lamp of Diogenes, that an honest and disinterested jury cannot practically be found in Liberty County. In Hewitt, the Supreme Court decision that initially set the standard for venue changes in cases of this sort, venue was changed only after the trial court "exhausted a venire of 125 persons without obtaining a qualified jury... ." Ward, supra, 328 So.2d at 262. That number was taken as significant in the Supreme Court's later decision in O'Berry v. State, 47 Fla. 75, 36 So. 440 (1904), reversing a change of venue order. This court reversed Rhoden v. State, 179 So.2d 606 (Fla. 1st DCA 1965), in which the trial judge changed the venue for trial after exhausting a panel of only 34 Hamilton County citizens. We reversed in Ward because the qualifications of only 18 Washington County veniremen had been determined. So we conclude here that this face-to-face inquiry into the fitness of only 23 Liberty County citizens cannot have constituted an "acid test" of the availability of an impartial jury drawn from that county, even when the voir dire is viewed in the light of subsequent testimony about county conditions.
In remanding these cases to Liberty County it seems almost trite to emphasize that we do not return them there for 15 trials or even, necessarily, for one. We return these cases for the more complete fulfillment of the best process our system of justice has for fashioning its most perfect ornament, the impartial jury. The judicial task of presiding over the selection of jurors in these cases will require great discernment and discretion, and in this we accord the able trial judge our utmost deference. "Judging of this type is an art," wrote Justice Alderman, "not a science," and the judge has no computer card bearing a mechanistic answer. Manning, supra, 378 So.2d at 279.
To Justice Alderman's wise counsel concerning the judge's task in jury selection we must add the corollary, equally to be kept in mind in the delicate examinations ahead, that the jury's task is not mechanical, either, and that jurors are not called to be ciphers or mere factfinding machines. On the contrary, they represent "the conscience and mores of the community in which the crimes were committed." E.g., Jones v. State, 332 So.2d 615, 622 (Fla. 1976) (Sundberg, J., concurring). That jurors represent the conscience of the community is the historic fact which inspired and gives continued life to the constitutional guaranty of "a speedy and public trial by impartial jury in the county where the crime was committed." Thus in any criminal case, especially in one of this character, and more especially in a potential series of 15 consecutive trials for offenses of this character, in a place as small as Liberty County, the felt conscience of the community will inevitably affect how the jurors perceive, comprehend, and apply the law to the evidence. The conscience of the community may affect their verdicts. It needs saying that this is no aberration. This is the constitutional scheme.
This means that the guilty verdict returned by a Liberty County jury in the first case tried, and any like verdict of a jury obtained for the trial of another of these cases, is to be regarded, if supported by the law and the evidence, as having deep significance. A crime such as vote-buying besmirches the community where it occurs; and nothing can be so cleansing as a verdict of the defendant's peers in the community condemning the deed. Certainly no verdict announced from another county, by a jury of strangers, can have comparable effect. Already in these cases Liberty County's accustomed circuit judge has been replaced by *842 a Leon County resident judge. Already the circuit prosecutor has been replaced by one from Escambia County, in another circuit. Now that last and most important element of local participation and responsibility, the Liberty County jury, is in jeopardy. We must not too hastily conclude that such a jury cannot be responsible, if by responsible we mean capable of convicting. We must not too hastily deprive this community of the dignity of judging its own. Whether those accused know it or not, their constitutionally recognized interest in a Liberty County trial is not alone their hope for acquittal; it is also in their interest, scarcely felt now, to be sure, that for them the Constitution makes even a guilty verdict more acceptable, and therefore more beneficial, by requiring its utterance by a jury in the county where the offense was committed. In terms of both public vindication and private chastisement, then, one such verdict, returned at Bristol by a Liberty County jury, may serve justice far better than a string of 15 guilty verdicts announced at Tallahassee by Leon County juries.
The converse is also true. An acquittal by a Liberty County jury, even if voted in the face of evidence the trial judge deems overwhelming proof of guilt, has deeper significance than sheer lawlessness. If for whatever reason there is widespread skepticism or hostility in Liberty County toward these prosecutions, that of course will be encountered during the selection of jurors. If the conscience of the community is in that condition, it may be expected to affect the deliberations of the most conscientious juror. Those prospective jurors who are intimidated, coerced, or otherwise tampered with, those whose fixed opinions cannot yield under any circumstance to the law and the evidence, and those who conceal their opinions are of course to be disqualified, for they have no judgment. But the juror who reflecting the conscience of the community acknowledges his skepticism or opposition to the prosecution may yet conscientiously say on oath, and under close questioning, that his opinion can yield to the law and the evidence, and that he will "well and truly try the issues ... and render a true verdict according to the law and the evidence... ." Fla.R. Crim.P. 3.360. If a panel composed of such jurors should finally acquit, in spite of evidence which others may think is sufficient to convict, the verdict is not to be condemned in law.
Whether a jury has the right to acquit in spite of the law and the evidence may be debated. Compare Keenan v. State, 379 So.2d 147, 148 fn. 5 (Fla. 4th DCA 1980), with State v. Thomas, 362 So.2d 1348, 1349 fn. 3 (Fla. 1978). That the jury has the power to acquit in those circumstances, and that we for two hundred years have preserved the accused's right to trial by a jury having that power, cannot be doubted. See Brown v. State, 206 So.2d 377, 382 (Fla. 1968), rejecting criticism of "the basic rule that gives to the accused the right to have the jury consider the evidence and, if it desires, find him not guilty of any crime, even though the trial judge might be fully convinced that the evidence overwhelmingly establishes his guilt." See also A. Scheflin, "Jury Nullification: The Right to Say No," 45 S.Cal.L.Rev. 168, 192 (1972):
Inherent in the concept of a lay jury composed of citizens who leave their normal life patterns, meld into a decision-making unit for the purposes of judging one of their number, and melt back into the community, is the ability to say no and the knowledge that it cannot be held against them. The jury serves as an ameliorating force tempering the rigidity of the law, and of the professionals who administer it, with the common sense realities of the community. In the criminal case, no man may be convicted without the verdict of his peers. If crime is unacceptable deviance from community values and standards, then a community judgment on that deviance must be made. In a democracy, people decide what is good for them, the government does not do it for them.
In other words, an impartial Liberty County jury is to be sought in these cases as something greatly to be desired, something *843 for which we have no adequate substitute; such a jury is therefore to be sought exhaustively, with perseverance. Certiorari is GRANTED, the order changing venue to Leon County is QUASHED, and the cause is REMANDED to Liberty County for further proceedings.
SHAW, J., concurs.
BOOTH, J., dissents with opinion.
BOOTH, Judge, dissenting:
The majority, in reversing the order below, turns a deaf ear to reality and arbitrarily imposes on the trial court the obligation of playing musical chairs for the sake of passing numbers of prospective jurors in and out of the jury box, "exhaustively." Justice, however, is not a numbers game. The order of the trial court and the record are replete with a showing supporting the trial court's determination that a fair and impartial jury cannot be obtained in Liberty County. Overlooked in the majority opinion are many of the pertinent facts and their significance; for example, the prior trials presided over by the same experienced trial judge, wherein 60 veniremen were examined, and the evidence considered, including 25 witnesses heard by the court on the venue motion, prior to its decision.
The holding of the majority is based on Ward v. State, 328 So.2d 260 (Fla. 1st DCA 1976). It is the Ward case which originates the purported requirement that there be an "exhaustive and unsuccessful attempt to select an impartial jury" before the motion of the State for change of venue can be granted. The majority states that to affirm the judgment below would require that this court recede from Ward. So be it. If this case is an example of what Ward requires, that prior decision of our court should be abandoned.
Nor do I agree that the so called "conscience of the community" is the standard by which these defendants are to be tried, thereby mandating that the trials be held in the community. The crime of vote buying has been defined by a larger conscience and is codified as Florida Statutes § 104.061(2). The majority views these proceedings as some kind of cleansing ceremony for the collective consciences of those residing in Liberty County and loses sight of the fact these are, first and foremost, criminal trials for which a fair and impartial jury is an absolute and essential ingredient.
The balancing of two important rights of an accused: the right to a fair trial and the right to trial in the county where the crime was committed, was addressed by the Florida Supreme Court in Hewitt v. State, 30 So. 795 (Fla. 1901), and the balance struck in favor of the right to a speedy trial before an impartial jury, as being "the greater and more important" of the two rights, the court holding (30 So. at 796):
We do not think it was the purpose of the framers of the constitution to force a trial in a county where an impartial jury cannot be had, as to do so would defeat the greater and more important right of a speedy and public trial by an impartial jury.
Florida Rules of Criminal Procedure, Rule 3.240, provides for motions by the State, as well as the defendant, for change of venue. This rule contemplates that the trial court grant such motion based on the court's consideration of affidavits and evidence.[1] An early case which states the rule is Ashley v. State, 72 So. 647, 648 (1916), wherein the court held:
Where an application in a criminal prosecution for a change of venue from the county where the crime was committed is made by the prosecuting attorney, and the accused objects thereto, the matter should be tested in some way so as to *844 make it to clearly appear that it is practically impossible to obtain an impartial jury to try the accused in that county... .
On an application by the state attorney for a change of venue in a criminal prosecution, even though the affidavit of the state attorney fully, clearly and positively sets forth facts that, when not controverted, prima facie make it appear that it may be impossible to obtain an impartial jury to try the accused in the county in which the crime was committed, yet when upon a counter showing it does not clearly and affirmatively appear that an impartial jury to try the accused cannot be obtained in the county where the crime is alleged to have been committed, the application to change the venue should be denied. (emphasis supplied)
Thus, in some instances, the State's uncontroverted affidavits alone can make a clear and sufficient showing without a "test." The test to be made is not limited, as the majority would hold, to an exhaustive and unsuccessful attempt to seat a jury. What "test" is needed or sufficient must depend on the circumstances of each case.
Here, the matter was "tested" in prior trials, where juries were seated, but the depth of the problem of obtaining impartial juries was made apparent. Beyond that, the trial court conducted an actual examination of numerous witnesses and considered affidavits and other evidence.
The majority concedes a "formidable showing" was made, but is hung up on the numbers. The State correctly points out that the critical issue is not the number of prospective jurors exhausted but whether the test conducted, together with the affidavits and other evidence, is sufficient to establish that it is practically impossible to obtain an impartial jury.
The most recent decision of the Florida Supreme Court on the subject is Manning v. State, 378 So.2d 274 (Fla. 1979), wherein the majority held that the defendant had been erroneously denied a change of venue, holding:
A trial judge is bound to grant a motion for change of venue when the evidence presented reflects that the community is so pervasively exposed to the circumstances of the incident that prejudice, bias, and preconceived opinions are the natural result. The trial court may make that determination upon the basis of evidence presented prior to the commencement of the jury selection process . . or may withhold making that determination until an attempt is made to obtain impartial jurors to try the case. (emphasis supplied)
The majority quotes with approval portions of the dissenting opinion of Mr. Justice Alderman in Manning that attempts to seat a jury are the "acid test" in a change of venue question, but ignores the paragraph immediately following, wherein Justice Alderman concludes he would uphold the trial court's denial of the defendant's motion for change of venue, and states:
The majority has substituted its judgment for that of the trial judge. I prefer to accept the evaluation of the trial judge, who was actually in the courtroom when the jury was selected.
Here, our court substitutes its judgment for that of an able trial judge, who had the benefit of being in the courtroom and observing the situation at first hand.
I respectfully dissent.
NOTES
[1] Rule 3.240, Fla.R.Crim.P.:

(a) The state or the defendant may move for a change of venue on the ground that a fair and impartial trial cannot be had in the county where the case is pending... .
.....
(d) The court shall consider the affidavits filed by all parties and receive evidence on every issue of fact necessary in its decision.
See also, American Bar Association Standards for Criminal Justice, Fair Trial and Free Press, Approved Draft, Rule 3.2.