733 So.2d 1057 (1999)
Dereck S. SAILOR, Petitioner,
v.
STATE of Florida, Respondent.
No. 98-1476.
District Court of Appeal of Florida, First District.
April 23, 1999.
*1058 Robert Woolfork, Tallahassee, for Petitioner.
Robert A. Butterworth, Attorney General; Edward C. Hill, Jr., Assistant Attorney General, Tallahassee, for Respondent.
EN BANC
BENTON, J.
As a defendant in an ongoing criminal proceeding, Dereck S. Sailor petitions for a writ of certiorari seeking to prevent a change of venue from Gadsden County to Madison County. Given the constitutional right of the "accused ... to have a speedy and public trial by impartial jury in the county where the crime was committed," Art. I, § 16(a), Fla. Const. (1968), the trial court departed from the essential requirements of law in ordering the case transferred to another county over defense objection. We therefore grant the petition for writ of certiorari, and quash the order changing venue.

I.
We have consistently granted petitions for writs of certiorari as a means of assuring defendants in criminal cases the right to stand trial in the county in which the crime of which the defendant is accused took place, including earlier in this very prosecution. See Sailor v. State, No. 97-3798 (Fla. 1st DCA Oct. 17, 1997); Beckwith v. State, 386 So.2d 836 (Fla. 1st DCA 1980); Ward v. State, 328 So.2d 260 (Fla. 1st DCA 1976); Davis v. State, 256 So.2d 565 (Fla. 1st DCA 1971). (The failure to raise the question by petition for writ of certiorari before trial is not, however, fatal to vindication of the right to be tried in the county in which the crime was committed. See Higginbotham v. State, 88 Fla. 26, 101 So. 233 (1924); Rhoden v. State, 179 So.2d 606 (Fla. 1st DCA 1965).)

II.
The state indicted Mr. Sailor and three co-defendants for first degree murder and attempted first degree carjacking, alleging that both crimes were committed in Gadsden County. A severance led to separate trials for each defendant. After Mr. Sailor's first two trials ended with hung juries, the state reduced the murder charge to second degree. (Following the second mistrial, the state moved for a change of venue, but the trial court denied the motion.) Mr. Sailor's third trial ended, just as the first two had, without the jury's reaching a verdict.
After the third mistrial, the state again moved for a change of venue, alleging substantial media coverage of each mistrial (as well as of the co-defendants' trials), and that a large portion of the population of Gadsden County had prejudged Mr. Sailor's guilt or innocence. Over defense objection, the trial court granted the state's second motion for change of venue.
Mr. Sailor then petitioned this court for a writ of certiorari in an effort to prevent the transfer, and we concluded that
the trial court's action in granting the state's motion for change of venue without conducting an exhaustive effort to empanel a jury in Gadsden County was premature and constitutes a departure from the essential requirements of law. See Beckwith v. State, 386 So.2d 836 (Fla. 1st DCA), review denied, 392 So.2d 1379 (Fla.1980). Accordingly, the petition for writ of certiorari is granted, the trial court's amended order transferring venue is quashed, and the matter is remanded to the Circuit Court in Gadsden County for further proceedings.
Sailor v. State, No. 97-3798 (Fla. 1st DCA Oct. 17, 1997). On remand, the trial court made its first effort after the third mistrial to empanel a jury, an effort that all but succeeded.
Starting with a jury pool of fifty-eight, the trial court ended up with five of the six *1059 jurors needed. Before voir dire, the trial court excused fourteen potential jurors. The trial court excused an additional twenty-six jurors for cause after voir dire, leaving eighteen potential jurors on the venire.[1]
The trial court allowed each side ten peremptory challenges. Once the defense exercised four peremptory challenges and the state exercised nine peremptory challenges, only five jurors remained. Mr. Sailor declined to accept a five-person jury, and the trial judge declared a mistrial, without ordering enforcement of any of the outstanding jury summonses[2] or making any other attempt to seat another juror.
Of four attempts to seat juries in this case, three proved successful. Before the first degree murder charge was dropped, fourteen jurors were reportedly selected for the first trial and thirteen jurors were reportedly selected for the second trial. Like the pending retrial, the third trial only required a six-person jury, and the trial court could have seated five jurors this time.
This record does not establish that the court made an "exhaustive attempt" to seat a jury before declaring a mistrial or that additional effort would not have proven successful. See Rhoden, 179 So.2d at 607 (reversing grant of a change of venue over defense objection where the trial court exhausted the venire in selecting five jurors).

III.
Read literally, the Florida Constitution unequivocally guarantees a criminal defendant the right to stand trial in the county in which the crime of which he is accused allegedly transpired. The concurring opinion suggests section 910.03, Florida Statutes (1997), can be read as reflecting a legislative view that the defendant's constitutional right to stand trial in the county in which the offense is alleged to have taken place is absolute.[3] Any change of venue without the consent of the defendant has been said to be of "doubtful validity." Stone v. State, 378 So.2d 765, 768 (Fla. 1979) (dictum). Nothing in the Florida Constitution explicitly authorizes a change of venue to another county over defense objection. See Rhoden, 179 So.2d at 607.
Instead, the constitution states without qualification that the "accused ... shall have the right ... to have a speedy and public trial by impartial jury in the county where the crime was committed." Art. I, § 16(a), Fla. Const. This right has existed continuously since the 1885 constitution[4] and guarantees that defendants "will be tried at home ... for crimes allegedly committed at home; that they will be tried abroad only for crimes committed abroad." *1060 Beckwith, 386 So.2d at 838; see Ward, 328 So.2d at 261-63.
Both in promulgating Florida Rule of Criminal Procedure 3.240(a) and in decisions on the question, however, our supreme court has recognized the possibility of a change of venue on the state's motion if a fair and impartial jury cannot be empaneled in the county where the crime was committed. But precedent does not support the view that the constitutional right to be tried in the county where the crime is alleged to have occurred hinges on the trial judge's assessment of the effects of media coverage or the mood of the community or the like.
While our supreme court has said that defense objection does not preclude a change of venue at the state's request, it has never actually upheld any such change of venue. Only once, indeed, has any Florida court approved a change of venue not explicitly requested or affirmatively agreed to by the defendant. See Hewitt v. State, 43 Fla. 194, 30 So. 795 (1901). The defendants in Hewitt did not object to a change of venue at the time the court ordered the change. The only issue on appeal there was whether a statute could constitutionally authorize a change of venue on the state's motion, even in the absence of timely objection. See id. at 795. The court held the constitution did not bar a change of venue, in the absence of contemporaneous objection, where "the trial court put the question of obtaining an impartial jury ... to actual test."[5]Id. at 796.
Since Hewitt, the Florida Supreme Court has decided cases in which trial courts granted state requests for change of venue over defense objection. See Higginbotham, 101 So. at 235; Ashley v. State, 72 Fla. 137, 72 So. 647, 648 (1916); O'Berry v. State, 47 Fla. 75, 36 So. 440, 443 (1904). In each case, the court reversed the defendant's conviction, holding the state had failed to establish that a fair and impartial trial could not be held in the county where the crime was committed. See Higginbotham, 101 So. at 234-35; Ashley, 72 So. at 649; O'Berry, 36 So. at 443. The Ashley court stated the rule, as follows:
Where an application in a criminal prosecution for a change of venue from the county where the crime was committed is made by the prosecuting attorney, and the accused objects thereto, the matter should be tested in some way so as to make it to clearly appear that it is practically impossible to obtain an impartial jury to try the accused in that county.
Ashley, 72 So. at 648; see also Higginbotham, 101 So. at 234 (holding that, unless the accused consents, the state's request for a change of venue may be granted "only when it is impossible to secure an impartial jury").
These cases make clear that the constitutional standardat the very least "to make it to clearly appear that it is practically impossible to obtain an impartial jury"is extremely stringent. In O'Berry, for example, a trial court had ordered a change of venue from Osceola County to Brevard County based on, among other things, the fact that the case was "discussed generally throughout the county" and that there were only "about 600 persons qualified to serve as jurors in Osceola county." 36 So. at 443. O'Berry's conviction "for the larceny of certain cattle" was nevertheless reversed. Id. at 440. The O'Berry court said:

*1061 It was not made to appear to the trial court, and we are in no way apprised, how many of the 600 jurors in said county were disqualified from acting as jurors in the case at bar. The fact that it might have been difficult or would have consumed considerable time to have procured a qualified jury to have tried the defendant is not sufficient to warrant a change of venue, against the consent of defendant.... [S]uch an important right must not be lightly treated.
36 So. at 443-44. To the same effect, the Ashley court held that examination of 118 talesmen after the venire had been exhausted in an unsuccessful effort to seat a jury was an insufficient showing of practical impossibility, saying:
In this case while the examination of the talesmen summoned under the several venires and the affidavits of the state attorney showed difficulty and delay in attempting to get an impartial jury in the county, there are affidavits stating that there are over 1,500 persons in the county who may be subject to jury duty, and giving other facts that at least tend to indicate the practicability of getting a proper jury in the county, even though perhaps several hundred of those persons had been called in securing juries in previous trials of the accused in the county for the same offense. The showing made does not clearly and affirmatively establish the impossibility of obtaining an impartial jury in the county to try the accused on this charge. In this view the order changing the venue is an unauthorized denial to the defendant of his organic right to a trial "by an impartial jury, in the county where the crime was committed."
72 So. at 649. The First Districtin which lie several of the least populous counties in the statehas never upheld a determination that it was practically impossible to seat a jury in any county. See Beckwith, 386 So.2d at 837 (fifteen defendants accused of buying votes in Liberty County [which in 1990 had a population less than one-seventh Gadsden County's]); Ward, 328 So.2d at 263 (trial judge in Washington County found "shocking evidence of an insidious effort to threaten or buy prospective jurors"); Davis, 256 So.2d at 565 (two previous mistrials); Rhoden, 179 So.2d at 607 (Hamilton County sheriffs brother charged with assaulting the sheriff). In each of the foregoing cases, this court reversed on grounds the state did not show that empaneling a jury was a practical impossibility.

IV.
Of interest in this connection are cases in which the defense seeks a change of venue on grounds of prejudicial pretrial publicity. Where the prosecution objects in such cases, much more serious efforts to seat juries have been mounted than the effort that was made here. The trial court in Rolling v. State, 695 So.2d 278, 286 (Fla.1997), "individually reviewed each of the 1233 responses filed by prospective jurors and, prior to voir dire, summarily excused over 800 of those summoned." Since the Court's decision in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), it has been clear that massive pretrial publicity does not in itself require a change of venue. See also Cole v. State, 701 So.2d 845, 853-54 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1370, 140 L.Ed.2d 519 (1998).

V.
Although an administrative order entered by a former chief justice recommends certain panel sizes for venires "to reduce costs and to minimize inconvenience to citizens summoned for jury service," the administrative order contemplates exceptions "on a case-by-case basis." Order In Re: Jury Management Program (Fla. Mar. 22, 1995) (Grimes, C.J.). With three prior mistrials and the attendant publicity the state's affidavits reflected, a larger panel was needed in order to make *1062 the requisite "exhaustive attempt" at seating a jury in the present case.

VI.
Other states having constitutional provisions giving the defendant the right to be tried in the county where the crime was allegedly committed look askance at prosecutorial requests for changes of venue. See, e.g., Mast v. Superior Court, 102 Ariz. 225, 427 P.2d 917, 918 (1967) (en banc) (quoting State ex rel. Sullivan v. Patterson, 64 Ariz. 40, 165 P.2d 309, 313 (1946)) (describing court's authority to change venue upon the state's motion as "to be exercised `with great care and deliberation', and the circumstances under which the power should be exercised are extremely limited"); Capps v. State, 268 Ind. 614, 377 N.E.2d 1338, 1340 (1978) (citing Blume v. State, 244 Ind. 121, 189 N.E.2d 568 (1963)); State ex rel. Hartinger v. Court of Common Pleas of Perry County, 84 Ohio App. 241, 86 N.E.2d 810, 813 (1948) (declaring that the state is not entitled to a change of venue even if it can establish substantial local prejudice); State ex rel. Ricco v. Biggs, 198 Or. 413, 255 P.2d 1055, 1062 (1953) (stating that, although a defendant may waive the right to be tried in the county where the crime was committed in order to secure a fair and impartial trial, these "constitutional guarantees are for the protection of the accused; they do not secure any rights to the state"); State v. Banks, 387 N.W.2d 19, 21 (S.D.1986) (stating that, if the trial court cannot obtain a fair and impartial jury in the county where the crime was committed, the defendant cannot be tried); State ex rel. Owens v. Brown, 177 W.Va. 225, 351 S.E.2d 412, 415 (1986) (stating the state's request for a jury from another county "is allowed only when there has been a clear and convincing showing on the record that it is necessary in order to obtain a fair and impartial trial"); State v. Mendoza, 80 Wis.2d 122, 258 N.W.2d 260, 269 (1977) (holding proceedings held in another county were void because "any venue change must be pursuant to defendant's waiver" and not over "the objection of the defendant").

VII.
The Sixth Amendment to the United States Constitutiona likely model for the state constitutional provision at issue hereprovides[6] that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." Amend. VI, U.S. Const. See United States v. Cabrales, 524 U.S. 1, 118 S.Ct. 1772, 1775, 141 L.Ed.2d 1 (1998) ("The Constitution ... safeguards the defendant's venue right."); United States v. Cores, 356 U.S. 405, 407, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958) ("The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place.").
The Federal Rules of Criminal Procedure permit the court to move the case to another district only "upon motion of the defendant." Fed.R.Crim.P. 21 (1998). See Gates v. United States, 122 F.2d 571, 577 (10th Cir.1941) (stating that the defendant has an absolute right to be tried in the district where the crime was committed); United States v. White, 611 F.2d 531, 534 (5th Cir.1980) ("The right of a criminal defendant to be tried in the district in which the crime was committed is guaranteed by the sixth amendment."). Only the defendant may waive the right to be tried on federal charges in the district where the crime was committed. See United States v. Polin, 323 F.2d 549, 556-57 (3rd *1063 Cir.1963) ("The Constitution provides that the defendant shall be tried in the District in which the crime was committed.... However, it is quite clear that this right is a privilege that may be waived by failure to make timely objection."); United States v. Gallagher, 183 F.2d 342, 346 (3rd Cir. 1950) ("[T]he venue privilege may be waived by an individual defendant.").
The petition for writ of certiorari is granted and the order changing venue is quashed.
BARFIELD, C.J., ERVIN, ALLEN, WEBSTER, DAVIS, VAN NORTWICK and PADOVANO, JJ., CONCUR.
PADOVANO, J., CONCURS WITH WRITTEN OPINION, IN WHICH WEBSTER and VAN NORTWICK, JJ., CONCUR.
BOOTH, J., DISSENTS WITH WRITTEN OPINION, IN WHICH JOANOS, MINER, WOLF, KAHN and LAWRENCE, JJ., CONCUR.
MINER J., DISSENTS WITH WRITTEN OPINION, IN WHICH BOOTH, WOLF, KAHN and LAWRENCE, JJ., CONCUR.
BROWNING, J., RECUSED.
PADOVANO, J. concurring.
The majority concludes that the order transferring venue must be reversed because the trial court failed to make a proper effort to seat a jury in Gadsden County. While I join in the court's decision on the facts, I think that this case can and should be decided on a more fundamental point of constitutional law. A criminal defendant has an absolute right under the Florida Constitution to be tried in the county where the crime was committed. We need not determine whether it was "practically impossible" to seat a jury in Gadsden County, because the trial court had no authority, in any event, to move the trial to another county over the defendant's objection.
Article I, section 16 of the Florida Constitution states in material part that "[i]n all criminal prosecutions the accused shall... have a right to have ... a speedy and public trial by impartial jury in the county where the crime was committed." This language is not equivocal or ambiguous. To the contrary, Article I, section 16 plainly grants the accused an unqualified right to trial in the county where the crime was committed. It is not the prerogative of the courts to limit this right or to create exceptions to the right.
All of the essential provisions of the Florida Constitution are regarded as mandatory. See Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963 (1912); State ex rel. West v. Butler, 70 Fla. 102, 69 So. 771 (1915); Weinberger v. Board of Public Instruction, 93 Fla. 470, 112 So. 253 (1927). The supreme court explained in Amos v. Gunn, 84 Fla. 285, 94 So. 615 (1922), that it did not regard any of the provisions of our "great charter of liberties" as merely directory. The court reasoned that if a constitutional provision is to be enforced at all, it must be treated as mandatory. So, it is not for us as judges to determine the circumstances in which Article I, section 16 will apply. Instead, we must treat the directive in this section as mandatory and apply it in all cases.
It is significant that the accused's right to be tried in the county where the crime was committed is contained within the same section that creates other absolute constitutional rights. For example, Article I, section 16 also provides that the accused shall have the right to counsel. This right is an absolute right which may be invoked by any defendant in any criminal case. see Deeb v. State, 131 Fla. 362, 179 So. 894 (Fla.1937).[7] Likewise, Article I, section 16 provides that the accused shall have a *1064 right to trial by jury. This right is also absolute. A defendant charged with a serious criminal offense is entitled to a jury trial, see Blair v. State, 698 So.2d 1210 (Fla.1997), regardless of the facts of the case. Among the remaining rights enumerated in Article I, section 16 is the right of the accused to cross-examine the witnesses called by the state. Here again, the right is absolute. See Coco v. State, 62 So.2d 892 (Fla.1953). No court has the power to rule that the right of cross-examination does not exist under a certain set of facts.
Courts are bound to interpret and apply like provisions of the Constitution consistently with each other. Sylvester v. Tindall 154 Fla. 663, 18 So.2d 892 (1944); Amos v. Mathews, 99 Fla. 1, 126 So. 308 (1930); Wheeler v. Meggs, 75 Fla. 687, 78 So. 685 (1918). We may conclude then that the right to trial in the county where the crime was committed is a right of the same character as the right to counsel, the right to a jury trial, and the right to cross-examine witnesses. Judges have no discretion to deny a criminal defendant these fundamental rights, merely because it would be inconvenient or even "practically impossible" to allow the defendant to assert them. By the same principle, judges have no authority to create exceptions to the defendant's constitutional right to a trial in the county where the crime was committed. If the framers of the Constitution meant to accord less weight to this right, they would not have included it in the same section along with all of these other absolute rights.
The first attempt to create an exception to the rule stated in Article I, section 16 was made in the Florida Legislature, not in the courts. An 1895 law provided that "the judge of the circuit court may order a change of venue in all criminal cases, when he shall be satisfied that it is impracticable to get a qualified jury to try the [case] in the county in which the crime was committed." See § 2928 Fla. Stat. (1895). This statute specifically authorized a change of venue "upon the application either of the prosecuting attorney or of the defendant, upon affidavit setting forth the necessity for such change." Id. The supreme court upheld a transfer of venue under the statute in Hewitt v. State, 43 Fla. 194, 30 So. 795 (1901), but the opinion does not set a precedent that the courts can involuntarily transfer venue against the defendant's objection. As the court noted in Hewitt, the defendant "neither requested or interposed any objection" to the change of venue. 30 So. at 795. While the language of the Hewitt opinion can be construed as approving the statute, the holding of the case stands for the unremarkable proposition that a defendant can waive the constitutional right to trial in the county where the crime was committed.
Subsequent decisions in the supreme court, including O'Berry v. State, 47 Fla. 75, 36 So. 440 (1904), Ashley v. State, 72 Fla. 137, 72 So. 647 (1916), and Higginbotham v. State, 88 Fla. 26, 101 So. 233 (1924), continued to recognize the exception for "practical impossibility" without ever applying it. In all of these cases, the court was interpreting the same statute it had considered earlier in Hewitt. It was not necessary in any of these cases to declare the statute unconstitutional, because the court found in every case that the effort to seat a jury fell short of that which was required by the statute.[8] Hence, while these opinions continued to recognize an exception that might, some day, authorize a change of venue over the defendant's objection, the decisions merely embrace the possibility of the exception to avoid declaring the statute unconstitutional.
The statute at issue in the line of cases from Hewitt to Higginbotham has long since been repealed. Unlike the statute *1065 the supreme court was construing in these early cases, the present statute contains no provision for a change of venue over the defendant's objection. Section 910.03(1), Florida Statutes (1995) states in material part that "criminal prosecutions shall be tried in the county where the offense was committed."[9] The statute goes on to say that the defendant can waive this right by moving to change venue to another county. Like the constitutional provision it was designed to implement, section 910.03(1), provides a clear and unambiguous statement of the applicable rule. The court must conduct the trial in the county where the crime was committed unless the defendant waives the protections afforded by Article I, section 16 by moving to transfer venue.
This construction of the substantive provisions of section 910.03(1), Florida Statutes is supported by the statutory remedy provided in the event that it is impossible to seat a jury in the county where the crime was committed. Section 910.03(3), Florida Statutes (1995) states that "[i]f a court finds that a fair and impartial jury cannot be impaneled in the county where the offense was committed" and if the jurors are to be sequestered, the court may "select a jury from a county other than where the offense was committed." The statute then explains that "[u]pon completion of jury selection, the jury shall be brought for trial to the county where the offense was committed."[10] As this provision reveals, the Legislature understood that a criminal defendant has an absolute constitutional right to trial in the county where the crime was committed. If that were not the case, the Legislature could have simply provided for a change of venue to another county, and would not likely have adopted the expensive and cumbersome procedure of importing sequestered jurors from another county.
The judicial branch could create an exception to the rights afforded to a criminal defendant under Article I, section 16 of the Florida Constitution and section 910.03, Florida Statutes only if those rights were in conflict with the constitutional rights of another party. That is not the case here. It cannot be said that the defendant's right to trial in a particular county conflicts with the right to an impartial jury, because that right belongs to the defendant, as well. Article I, section 16 states that "[i]n all criminal prosecutions the accused shall ... have the right [to trial] by impartial jury." (emphasis supplied). Nor are the constitutional rights of any other party in conflict with the defendant's constitutional right to trial where the crime was committed. Consequently, the court has no cause to diminish this right by creating an exception to the rule plainly stated in the constitution.
It is true that rule 3.240 of the Florida Rules of Criminal Procedure refers to a change of venue on the motion of the "state or the defendant," but this rule is based on statutory authority that no longer exists. The rule was adopted in 1968, and, as explained in the committee notes, it was based on sections 911.02 through 911.05, Florida Statutes. These statutes allowed a change of venue on the motion of the state or defense, much like the early statute at issue in Hewitt, but they were repealed by an act of the Legislature in 1970. See Fla. Laws Ch. 70-339 § 180 (1970). In 1971, the Legislature enacted a new criminal venue statute which did not contain a provision for change of venue by *1066 the state. See § 910.03 Fla. Stat. (1971).[11]
Even if rule 3.240 could be construed to allow a motion for change of venue on the state's motion, that part of the rule would not take precedence over the conflicting provisions of the current venue statute. Section 910.03, Florida Statutes (1995), provides that "criminal prosecutions shall be tried in the county where the offense was committed," and, unlike the statutes in existence before 1970, it does not contain any provision that would allow for a change of venue on the state's motion. Because the statute deals with a substantive issuethat is, the defendant's entitlement to trial in a particular countyit must prevail over anything to the contrary in a rule of procedure. See State v. Garcia, 229 So.2d 236 (Fla.1969); State v. L. H., 392 So.2d 294 (Fla. 2d DCA 1980); Oceania Joint Venture v. Ocean View of Miami, 707 So.2d 917 (Fla. 3d DCA 1998).
The disputed exception for cases in which it is "practically impossible" to seat a jury has never been applied in any case during the nearly one hundred years between the Hewitt opinion and the present case. Instead, the courts continue to avoid a decision on the threshold constitutional issue by holding in each case that the test was not met. In effect, the dicta in these opinions becomes more settled as it is repeated. Yet there has never been any legal basis for it.
Nor is there any practical reason to acknowledge the exception after all of these years. If the Florida courts have not yet been able to identify a case in which it would be proper to apply the exception, then it is logical to conclude that there is no need for the exception. The better approach, in my view, would be to apply the bright-line rule supplied by the constitution itself. There is no need to review the facts of each case to determine whether the trial court made an adequate effort to seat a jury, because the constitution does not permit an involuntary change of venue in any criminal case.
In summary, I think that this case should have been decided on a threshold point of Florida constitutional law. The order transferring venue should be reversed because Article I, section 16 affords a criminal defendant an absolute right to trial in the county where the crime was committed.
BOOTH, J., DISSENTING.
I respectfully dissent from the views expressed in the majority and concurring opinions and would hold (1) that rule 3.240, Florida Rules of Criminal Procedure, is valid, and (2) that the motion for change of venue was not improvidently granted.
Rule 3.240, Florida Rules of Criminal Procedure, provides:
Change of Venue
(a) Grounds for Motion. The state or the defendant may move for a change of venue on the ground that a fair and impartial trial cannot be had in the county where the case is pending for any reason other than the interest and prejudice of the trial judge. [Emphasis supplied.]
Rule 3.240 (formerly rule 1.240) was originally adopted effective 1968, and has remained essentially unchanged. The rule replaces, and is derived from, earlier Florida statutes having substantially similar language, to wit:[12]
[o]n a prosecution by indictment or information the State or the defendant *1067 may apply for removal of the cause on the ground that a fair and impartial trial can not be had for any reason other than the interest or prejudice of the trial judge. [Emphasis supplied.]
Since 1885, provisions of the Florida Constitution providing rights of fair trial by an impartial jury in the county where the crime was committed have remained essentially unchanged. Art. I, § 16(a), Fla. Const. (1968); Art. I, § 11, Fla. Const. (1885).
The public's confidence in the institution of trial by jury "depends upon the purity of the tribunal, and the fairness of its decisions." To safeguard this institution, a trial must be by impartial jurors. Walsingham v. State, 61 Fla. 67, 77, 56 So. 195, 198 (1911). A fair and impartial jury, by definition, is one that is unbiased and favors neither the State nor the defendant.[13]
The Florida Supreme Court has been empowered by Article V of the Florida Constitution to adopt rules governing practice and procedure, as follows:
The supreme court shall adopt rules for the practice and procedure in all courts.... These rules may be repealed by general law enacted by two-thirds vote of the membership of each house of the legislature.
Art. V, § 2(a), Fla. Const. In re Florida Rules of Criminal Procedure, 196 So.2d 124 (Fla.1967), provides that rules of the supreme court shall supersede all conflicting rules and statutes and that all statutes not superseded by the rules, and not in conflict, will remain in effect as rules promulgated by the supreme court. Id. at 124. Florida Statutes section 25.371 also provides for superseding effect.
The Florida Supreme Court has exercised its rulemaking power not only with the adoption of the venue rule in question, but also as to other rights of fair trial set forth in Article I, Section 16(a), to wit: speedy trial[14] and public trial.[15] Thus, constitutional rights are properly the subject of procedural rules adopted by the Florida Supreme Court.[16]
Florida Statutes section 910.03, cited in the majority and concurring opinions, applies where the place of the crime is unknown.[17] Section 910.03 does not refer to the State's right to request a change of venue. Conflict created by that omission, if any, is resolved in favor of the rule provision. Johnson v. State, 308 So.2d 127, 128 (Fla. 1st DCA 1975); § 25.371, Fla. Stat.
This court has considered the constitutionality of rule 3.240 in a number of cases and found it valid, subject to the requirements governing the State's request for change of venue. In Beckwith v. State, 386 So.2d 836, 838 (Fla. 1st DCA), rev. denied, 392 So.2d 1379 (Fla.1980), this court stated:
There is but one constitutional exception to the rule [of venue], namely, "the impossibility of securing an impartial jury in that county." Hewitt v. State, 43 Fla. *1068 194, 199, 30 So. 795, 796 (1901) imposed that constitutional restriction on a statute which seemingly authorized more liberal changes of venue; and Ward concluded that the Supreme Court would read that same constitutional restriction into Fla.R.Cr.P. 3.240, together with the test determining "impossibility" as prescribed by other Supreme Court decisions.
Thus, the defendant's constitutional right to be tried in the county where the crime was committed is not absolute, but is subject to the qualification, to wit: "impossibility of securing an impartial jury." Beckwith defines impossibility as "practically impossible" and states that the term does not mean "absolutely impossible." 386 So.2d at 838. Beckwith prescribes an actual test of ability to seat an impartial jury, as follows (386 So.2d at 838):
And the way for the trial judge to determine that possibility or impossibility is to summon a venire, swear them, join with counsel in asking them questions bearing on their qualifications, and excuse both the partial jurors and the evasive ones by exercising that skill of judgment....
In the instant case, Appellant has not challenged the validity of rule 3.240.[18] The issue raised and briefed by the parties is the sufficiency of the attempt to seat the jury and whether the trial court abused its discretion in ruling that it was "practically impossible" to obtain an impartial jury. Beckwith, supra.
The tragic events giving rise to this case began on July 5, 1996, with the carjacking and murder of a 16-year-old boy. The four young men charged with the crimes were Clemens, Turner, Williams and Petitioner Sailor. All four were tried separately in proceedings extending over 13 months, down to and including the last attempt to seat a jury following this court's remand to the trial court in Petitioner's case.[19] Each of the seven trials (three of Petitioner) were the subject of intensive media coverage, as outlined by the trial court in its order here under review.
The record before us shows there were compelling circumstances justifying the trial court's removal of this cause. However, such circumstances, in and of themselves, are not sufficient where the defendant objects to the removal, unless there is also an actual attempt to seat a jury. For example, in Beckwith, supra, the trial court relied on circumstances indicating difficulty in seating an impartial jury, but the court did not attempt to seat a jury. This court's opinion in Beckwith quashes the order changing venue and discusses at length the need for an "exhaustive effort" *1069 to seat a jury. However, since there was in fact no effort at all, the discussion is purely advisory. Similarly, in the cases of Davis, supra, O'Berry, supra, Higginbotham, supra, and Deeb, supra, there was no attempt to seat a jury, contrary to the plain requirement of the law, as stated beginning with Hewitt, supra.
The cases of Rhoden, supra, Ward, supra, and Ashley, supra, relied on in the majority opinion, are also not authority for reversing the case below. In Rhoden, supra, application for change of venue was untimely filed and its contents did not meet the existing statutory requirements. In Ward, supra, after "several veniremen had been examined on voir dire," the trial court interviewed 13 veniremen in open court and another 15 privately before determining that a fair and impartial trial could not be conducted in that county. However, the trial court's effort would not meet the requirements stated in Beckwith, supra at 838, i.e., that the court summon a venire, swear them, and join with counsel in asking them questions. The attempt in Ward was abortive, at best.
In Ashley, supra, there were apparently compelling circumstances of an undisclosed nature. There was also an actual attempt to seat a jury, during which 118 veniremen were served and answered, but apparently only 9 were accepted before the trial court granted the State's motion and transferred the cause to Dade County. On appeal, the supreme court noted the difficulties in attempting to seat a jury in the case and stated that there were affidavits "giving other facts that at least tend to indicate the practicability of getting a proper jury in the county...." 72 So. at 649. The opinion does not indicate the nature of the facts referred to.[20]
In the instant case, the trial court attempted to seat a jury. Of the 155 persons summoned for jury duty, 58 appeared; 14 were disqualified, and the remaining were subjected to voir dire examination. We have not been furnished with a transcript of that voir dire, which extended over 2-½ days. On appeal, it must be assumed that the information revealed in voir dire was supportive of the trial court's decision, as is the record before us.
There is no requirement that a particular number of jurors, or a percentage of the population, must be examined on voir dire.[21] Common sense dictates that the number of jurors that must be questioned on voir dire will vary according to the circumstances. The attempt to seat a jury is part of, and invariably accompanied by, compelling factual situations that may include, among other things, prior *1070 proceedings involving the same crime, the notoriety of the defendant and victim, and widespread and detailed knowledge of the case in the community. The purpose of requiring an "actual test" is to confirm or refute the fact that the compelling circumstances alleged in the motion for change of venue do exist and have infected the jury pool so that it would be practically impossible to seat an impartial jury.
Here, after the previous trials of Petitioner, the State had reduced charges against Petitioner so that a six-person jury would suffice to try him. Even with that reduction, however, the ever increasing notoriety and polarization of the community, based on all the prior proceedings and shown by the record before the judge, resulted in this last failed attempt.[22]
The supreme court in Reed v. State, 560 So.2d 203, 206 (Fla.1990), cert denied, 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990), held that appellate courts "must necessarily rely on the inherent fairness... of our trial judges who are on the scene and who themselves get a `feel' for what is going on in the jury selection process." In Beckwith v. State, 386 So.2d 836, 839 (Fla. 1st DCA), rev. denied, 392 So.2d 1379 (Fla.1980), this court stated that deference to the trial judge's conclusion is particularly warranted given his direct participation in the effort to seat a jury, his first-hand familiarity with the community wherein the court over which he presides is located, and his examination of the media coverage.
In this case, unlike Beckwith, the trial court participated in an extensive effort to seat a jury, and the court's decision is supported by the record. This court should deny the petition for certiorari and allow the cause to be tried in Madison County, as ordered by the trial court.
MINER, J., Dissenting.
I concur in Judge Booth's dissenting opinion in all respects and write separately to emphasize the obvious and to set forth what I believe to be record support for the order under review.
If the majority and concurring opinions are legally correct in their contention that one charged with a crime has an absolute constitutional right to be tried in the county in which the crime was allegedly committed, one need not engage in pointless debate about whether a trial judge made an "exhaustive effort" to seat a jury before ordering a change of venue on the State's motion over a defendant's objection. It is only after the constitutional question is resolved that we need to concern ourselves with what, in fact, supports or militates against the trial court's decision to grant the State's change of venue motion in the case at bar. Since Judge Booth has addressed the constitutional issue in her opinion, I will direct my comments only to the reasons why I believe the trial judge's decision to change venue in Sailor's case to Madison County should be upheld.
On July 5, 1996, Hamilton Fenn, a 16 year old white high school student was murdered in the course of an attempted carjacking. His accused murderers were four black teenagers, including Dereck Sailor, then age 16, the son of a prominent minister. Both the Fenn and Sailor families are respected residents of Gadsden County and, as might be expected in any small, rural county, every aspect of what transpired in connection with this shocking and tragic incident was scrutinized and speculated upon in depth and at great length by both the local and regional print and broadcast media. In time, the four defendants were indicted for first degree murder and attempted armed carjacking.
Because there were conflicting accounts and finger-pointing among the accused regarding *1071 what occurred on the day in question, the trials of the four defendants were severed and each was scheduled for trial separately. Like the initial accounts of this tragedy, the media reported on each development, including all pre-trial proceedings as these cases wound their way toward trial. Indeed, no happening, substantive or seemingly inconsequential, evaded media attention, and, it seems that any development, no matter how small, served as a springboard for the media to recount, in great detail, all that had transpired from the day of the murder up to and including the matter then being reported upon. Indeed, as Mr. Woolfork, Sailor's attorney, concedes, "few cases in Gadsden County have had the number of multi-defendant trials or the publicity as this case and the companion co-defendants' cases."
In early January 1997, the first of the four defendants was tried and found guilty of second degree murder and attempted carjacking. On January 17, the first of defendant Sailor's trials commenced. His defense was that although he admitted driving the automobile which the four defendants used to follow and head off young Fenn at the rural crossroads where he was murdered, he was coerced into doing so by an older member of the foursome, whom he feared. When the jury could not reach a verdict, a mistrial was declared.
One by one, the other defendants were brought to trial and convicted as charged or of some lesser included offense. Sailor's second trial commenced on March 27, 1997, and again ended in a mistrial when the jurors could not agree on a verdict. After this second mistrial, Mr. Woolfork expressed apprehension at the prospect of a third trial in Gadsden County. He was quoted in a local newspaper as having said: "People probably have made up their minds one way or the other and they bring that to the jury." Following this expression, a regional television station conducted a man-on-the-street type interview in Gadsden County and concluded in a 6:00 p.m. newscast that "most" Gadsden Countians had formed firm and fixed opinions regarding Sailor's guilt or innocence.
At this point in the proceedings, with supporting affidavits from a cross-section of responsible citizens, both black and white, the State moved to change venue to another locale, asserting that Gadsden County had been so saturated with media accounts of the several trials involving Hamilton Fenn's alleged murderers that it would be virtually impossible to seat another jury in Sailor's case that could impartially try the issues on the evidence presented in the courtroom without being influenced by outside factors.
At a hearing on the State's motion, the defendant called several witnesses who opined, in general, that they had faith that Gadsden Countians could be depended on to be fair and impartial in the matter if what one described as the "right" evidence was produced at trial. However two of these witnesses, Rev. Sumpter and a current county commissioner, Edward Dixon, testified that many Gadsden Countians had formed fixed opinions on the merits of the case. A former county commissioner testified that the matter of Sailor's guilt or innocence had "become a racial issue" and that race had "become the tone of the community." At the conclusion of the hearing, the trial court denied the motion, opting once again to try to seat another jury for Sailor's third trial which, like the previous two, ended in mistrial when jurors could not agree on a verdict.
In the first seven months of 1997, Hamilton Fenn's murder gave rise to seven different trials, three involving Dereck Sailor. Sometime during this seven month period, Mr. Woolfork, in a televised interview, stated that "the State should be satisfied with convicting three of the four accused murderers" and should not retry Sailor. Following this statement, another televised interview with a number of Gadsden Countians led to the conclusion that community sentiment was against Sailor's retrial. Also, during this period, Dereck *1072 Sailor and his father, Rev. Sailor, gave television interviews about the case.
After Sailor's third trial ended as had the previous two, the State renewed its motion to change venue citing its continuing belief that a fair and impartial jury could not be seated. After a hearing the court granted the State's motion over the defendant's objection and defendant petitioned for certiorari to this court. The matter was returned to the trial court for yet another attempt to seat a jury. Since Judge Booth has outlined what transpired during the attempt to seat a fourth Gadsden County jury in Sailor's case, repetition here is unnecessary.
In the record before us, one thing is clear beyond peradventure. At the time Judge Gary transferred venue of this case to Madison County, not only had Gadsden Countians been saturated with published and broadcast accounts of all aspects of this tragic incident and its aftermath, but if affiants and the print and broadcast media are correct, most citizens in the County had formed firm and fixed opinions regarding Dereck Sailor's culpability and/or believed he should not be retried.
Particularly troubling also is the view of former County Commissioner Anthony Powell expressed during the hearing on the State's first motion to change venue, that the matter of Sailor's guilt or innocence had become a racial issue given the racial "tone of the community." It goes without saying that the Fenn tragedy would only be compounded were Dereck Sailor's guilt or innocence to be decided because the murder victim was white and Sailor is black. Obviously, the converse is also true.
Another thing I find to be disquieting is what I believe to be a patent attempt by defense counsel to conjure up sympathy for his client's cause by making Sailor available for television interviews between trials and for his own televised remarks regarding retrial of his client. I believe it also to be something more than a coincidence that Rev. Sailor also addressed a television audience regarding his son's case. Moreover, the State's uncontradicted allegation that the Sailor case has been the subject of comments delivered from church pulpits and school classroom discussions of the matter further supports moving this case out of Gadsden County.
Another factor which it seems to me must be considered in testing the order under review is the obvious reluctance of a number of the prospective jurors to serve as jurors on the fourth Sailor case. Community pressures that can be brought to bear to decide a criminal case one way or another in a small, rural county present the single greatest danger that jurors may succumb to the temptation to decide cases based on considerations other than the evidence presented in the courtroom.
A careful review of the dozens of cases involving venue issues that have been decided in Florida since the turn of the century reveals that none has involved a factual scenario even remotely resembling the undisputed facts in the case at bar. In deciding whether to grant the change of venue over the defendant's objection, Judge Gary was presented with the following considerations, among others: seven trials in seven months in a small, rural county involving the same basic facts and the same participants; both the victim and the accused were teenagers from well known and respected families in the community; three mistrials involving Dereck Sailor and a failed attempt to seat a jury to conduct a fourth trial; pervasive media coverage blanketing the county before, during, and after each trial had taken place; television interviews granted by the accused, his attorney, and his father, Rev. Sailor; televised comments by his lawyer to the effect that Sailor should not have to be subjected to another trial; a juror interview published after Sailor's second trial not only reporting the spread of juror voting but the tenor of the conversation in the jury room; a prospective venire containing numerous persons expressing their *1073 willingness to serve as jurors "in any other case but this one"; and at least two "polls" conducted by a local television station and broadcast on evening news programs purporting to reflect community attitudes regarding Sailor's guilt or innocence and whether he should be retried.
In the exercise of the discretion vested in him by law, Judge Gary transferred further proceedings in Sailor IV to Madison County. In so doing, he concluded that the factors outlined above in combination made it impossible as a practical matter to seat yet another fair and impartial jury in Gadsden County to try Dereck Sailor once again.
In Manning v. State, 378 So.2d 274, 276 (Fla.1979) (citations omitted), the Florida Supreme Court reaffirmed its commitment to the test enunciated in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); McCaskill v. State, 344 So.2d 1276 (Fla.1977); and Kelley v. State, 212 So.2d 27 (Fla. 2d DCA 1968), for determining whether to grant a change of venue:
[A] determination must be made as to whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.[23]
An application for change of venue is addressed to the sound discretion of the trial court.... A trial judge is bound to grant a motion for a change of venue when the evidence presented reflects that the community is so pervasively exposed to the circumstances of the incident that prejudice, bias, and preconceived opinions are the natural result. The trial court may make that determination on the basis of evidence presented prior to the commencement of the jury selection process, or may withhold making the determination until an attempt is made to obtain partial jurors to try the cause.
The Manning court also noted that each case where a change of venue is requested must stand on its own facts and that what occurs in a rural community may be vastly different from that which occurs in a more urban setting:
Each case must be judged on its own merits as to whether under the circumstances the inhabitants in the community are so infected by knowledge of the incident and accompanying prejudice that jurors from the community could not possibly try the case solely on the evidence presented in the courtroom.
378 So.2d at 276.
Writing in dissent because he differed with the majority on the result reached, Justice Alderman, while acknowledging his agreement with the general principles of law expressed by the majority, offered the view that
[i]n some cases, it is not advisable for a trial judge to rule on a motion for change of venue until after the jury selection process actually begins. This is the "acid test" to determine if it is possible to obtain a fair and impartial jury. During the jury selection process the trial judge is in the best position to make the final decision as to whether a fair and impartial jury can be obtained. He has the opportunity to observe firsthand the prospective jurors during the voir dire examination, to weigh the credibility of their answers, and to judge the state of their minds as well as the general atmosphere in the courtroom and the community.

Judging of this type is an art, not a science. It is not possible to reduce all the elements considered by a trial judge in such a system to a computer card and obtain a mechanistic answer. In deciding *1074 a motion for change of venue, more is involved than the sterile application of legal principles. The trial judge must also function as a finder of facts.

Id. at 279 (emphasis added).
In Manning, it was the defendant who sought a change of venue over the objection of the State. (Such is the situation in the overwhelming number of reported cases in this State.) In the case at bar, it is State that seeks a change of venue which the defendant opposes. In such a circumstance, this court has held in Beckwith v. State, 386 So.2d 836 (Fla. 1st DCA 1980), that when the State urges the practical impossibility of securing an impartial jury, what is required is a showing that such a jury cannot be secured by exhaustive or persevering judicial effort. This is the so-called "acid test" to which Justice Alderman referred in Manning. As for the application of an "acid test" to a case such as the one at bar, given the unique set of circumstances outlined above, I respectfully suggest that the court was possessed of more than sufficient reasons to change venue to Madison County.
Whether Dereck Sailor is found guilty or not guilty of the offenses with which he stands charged needs to be determined once and for all, one way or another. By transferring venue, Judge Gary has selected an appropriate setting to bring whatever closure the law can muster at the trial court level to all victims of this senseless tragedy. If he has abused his discretion, as the majority holds, then, indeed, this court has turned a deaf ear to Justice Alderman's admonition in Manning by reducing the elements Judge Gary considered to a computer card and, in so doing, has produced a mechanistic rather than a realistic answer.
NOTES
[1] The record indicates that forty-two people summoned for jury service for circuit court civil trials and county court misdemeanor trials were not required to perform any type of jury service. No attempt was made to ensure these people would be available to serve if difficulties in seating a jury were encountered in Mr. Sailor's case. These prospective jurors were instead simply released once juries were seated for the circuit civil and county court cases.
[2] Of one hundred fifty-five jurors summoned for jury duty, only fifty-eight appeared.
[3] Section 910.03, Florida Statutes (1997) does not prohibit state motions for change of venue. But subsection three authorizes a trial court seating a jury that is to be sequestered, when "a fair and impartial jury cannot be impaneled in the county where the offense was committed" to select a jury outside the county to "be brought for trial to the county where the offense was committed." § 910.03(3), Fla. Stat. (1997).
[4] The 1885 constitution guaranteed an accused a trial "in the county where the crime was committed." Art. I, § 11, Fla. Const. (1885). This language reenacted elements of the 1838 constitution that guaranteed an accused the right to "a speedy and public trial by an impartial jury of the county or district where the offence was committed." Art. I, § 10, Fla. Const. (1838); see also Joseph W. Little & Steven E. Lohr, Textual History of the Florida Declaration of Rights, 22 Stetson L.Rev. 549, 578-80, 619 (1993).
[5] The Hewitt court did much more to test the feasibility of obtaining an impartial jury than the trial court did here. In Hewitt v. State, 43 Fla. 194, 30 So. 795, 795 (1901), as here, the first attempt to try the defendants ended in a mistrial. The trial court then attempted to empanel a jury to retry the defendants. See id. Only "after the exhaustion of two special venires, one for 100 jurors and the other for 25, and the issuance of another for 30 jurors," did the court order the change of venue without objectionfrom Bradford to Duval County. Id. In 1900, the population of Bradford County was 10,295 people. In contrast, the population of Gadsden County was 41,105 in 1990.
[6] The portion of the Sixth Amendment requiring that a case be tried in the state and district where the crime was committed applies to federal prosecutions only and is not applicable to proceedings in state court. See Caudill v. Scott, 857 F.2d 344, 345-46 (6th Cir.1988); Cook v. Morrill, 783 F.2d 593, 595-96 (5th Cir.1986); Martin v. Beto, 397 F.2d 741, 748 (5th Cir.1968). See also U.S. Const. Art. III, § 2, cl. 3 ("Trial of all Crimes... shall be held in the State where the said Crimes shall have been committed.").
[7] While there are limits on the right to have counsel appointed at government expense, see Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), the constitution does not otherwise limit the defendant's right to appear with counsel.
[8] The language of the opinion in Higginbotham approves of the statute. However, the court did not apply the statute against the defendant, because it found the exception inapplicable under the facts of the case.
[9] The statute contains an exception which allows the defendant to plead guilty or nolo contendere in another county, see § 910.035, Fla. Stat. (1995), but it does not contain any exception that would authorize the court to conduct a criminal trial in another county.
[10] The courts have not addressed the constitutionality of the remedy provision in section 910.03(3), Florida Statutes (1995), and this opinion should not be construed as a comment on that issue. The statute is cited here only to show that the Legislature must have been aware of the limitations imposed by Article I, section 16.
[11] Section 910.03, Florida Statutes (1971) provides that "criminal prosecutions shall be tried in the county where the offense was committed, but if the county is not known, the accused may be charged in two or more counties conjunctively and before trial the accused may elect the county in which he will be tried." (emphasis added).
[12] Ch. XI, § 8663(179), Comp. Gen. Laws of Fla. (Supp.1940); Ch. 19554, § 172, Laws of Fla. (1939); Ch. 2929, Rev. Stat. (1892); Ch. 87, § 25, Digest of Laws (McClellan's 1881); Ch. II, § 3, 2., Manual or digest of Stat. Law (Thompson 1847); Act VII, § 1, Laws of Fla. (1845).
[13] Rights of venue are founded on the right to an impartial jury. In Deeb v. State, 131 Fla. 362, 179 So. 894 (1937), the Florida Supreme Court held:

Trial by an impartial jury is quite as important to an accused and to the proper administration of justice as is a trial in the county where the crime was committed. [Citations omitted.]
In order to effectuate the two above-mentioned organic rights, the statutes provide for a change of venue in criminal prosecutions in the circuit courts upon the application either of the prosecuting attorney or of the defendant, upon affidavit setting forth the necessity for such change.
See Black's Law Dictionary 595, 752 (6th ed.1990).
[14] Fla. R.Crim. P. 3.191 and 3.251.
[15] Fla. R.Crim. P. 3.251.
[16] See Commentary, 33 Fla. Stat. Ann. v (West 1975).
[17] Florida Statutes section 910.03(3), allowing the selection of a jury from another county, was not asserted below and is not an issue here.
[18] That constitutional issue is considered ex mero motu in the majority and the concurring opinions and, therefore, is addressed in this dissent.
[19] Time-line:

1/17/97 Sailor's first trial (hung jury).
1/30/97 Williams tried and convicted.
3/13/97 Turner tried and convicted.
3/27/97 Sailor's second trial (hung jury).
4/17/97 Clemens tried and convicted of armed carjacking; hung jury on first-degree murder
 charge.
4/29/97 State's first venue motion; denied.
6/97 Clemens convicted of first-degree murder.
6/23/97 Sailor's third trial (hung jury).
7/21/97 State's second venue motion.
8/7/97 Hearing on State's second venue motion.
9/3/97 Amended order transferring venue.
10/3/97 Petition for Certiorari filed at this court.
10/17/97 Order of this court in case # 97-3798 reversing and remanding for further proceedings.
2/9-11/98 On remand, voir dire examination of 58 prospective jurors failed to secure the required 6
 jurors.
3/25/98 Trial court's order granting State's renewed venue motion.

[20] After the case was transferred to and tried in Dade County, the murder conviction was set aside for improper venue.
[21] Early Florida statutes provided for a change of venue when there were not sufficient registered voters in the county to form a grand and petit jury. For example, the statute in effect at the time of Ashley, supra, Section 3997 (Gen.Stat. of Fla. (1906), Compiled Laws of Fla. (1914)), provided:

Whenever it shall be made to appear to the satisfaction of the presiding judge of any of the circuit courts of this State that the venue of any cause, then pending in such court, should be changed either because a fair and impartial trial cannot be had in the county where the crime was committed, or because it is impracticable to get a qualified jury to try the case in the county where the crime was committed, or where it appears from the examination of the books of registration of the county, that there are not a sufficient number of registered voters to form a grand and petit jury, it shall be in the power and discretion of such judge to change the venue of such case, from the circuit court of the county where such cause is at the time pending to the circuit court of any other county within the same circuit. [Emphasis supplied.]
Therefore, the early cases, such as Hewitt, supra, O'Berry, supra, Ashley, supra, and Higginbotham, supra, referring to the total number of persons available for jury duty in the county, is likely related to the underscored portion of the above statute pertaining to sufficiency of registered voters. This reference should not be interpreted as indicating a need to summon and voir dire the total persons available to establish impossibility of obtaining an impartial jury.
[22] Since we have not been furnished a transcript of the voir dire proceedings, we do not know whether the five remaining jurors had been subjected to all challenges and sworn. Also, the majority fails to consider the probable need for alternates. Fla. R.Crim. P. 3.280.
[23] See also Rolling v. State, 695 So.2d 278 (Fla.1997); Copeland v. State, 457 So.2d 1012 (Fla.1984).